# Tremont Township School District v. Western Anthracite Coal Company

*Charles L. Frank*, for plaintiff.

*Hicks, Williamson & Friedberg* and *Ralph M. Bashore*, for defendant.

DALTON, J., April 21, 1952.—The judgment debtor in this attachment execution proceeding has presented

a petition praying for the allowance of a credit against the judgment and asking that execution be restricted to the amount of the judgment as thus reduced. The judgment imposed personal liability upon defendant for certain delinquent school taxes. The credit is claimed because the lands on which the taxes were levied were subsequently sold, along with other lands of defendant, by the Tax Claim Bureau of Schuylkill County at a private tax sale to Hickory Contracting Company, and plaintiff school district received a proportionate share of the proceeds of that sale.

The instant proceeding is merely one phase of a much broader tax delinquency situation involving defendant coal company and which has given rise to voluminous litigation in this court over the past several years. We shall state only such facts as are necessary to an understanding of the question presently before us. The factual background, even so limited, is extremely complicated.

Defendant, Western Anthracite Coal Company, was the owner of numerous tracts of land, some seated and others unseated, situate in Tremont Township. On September 1, 1942, nine of the *unseated* tracts owned by defendant were sold at a county treasurer's tax sale to the county commissioners. Likewise, on September 16, 1944, the county treasurer sold 20 of the *seated* tracts to the county commissioners. Exceptions were filed to the latter sale but argument thereon was repeatedly postponed by agreement of counsel. When the Real Estate Tax Sale Law of July 7, 1947, P. L. 1368, became effective in this county, the county commissioners turned the properties over to the tax claim bureau pursuant to section 701 of that act (72 PS §5860.701). On July 6, 1949, which was 16 days subsequent to the judgment hereinafter mentioned, the exceptions to the 1944 sale of the seated lands were withdrawn by agreement between the county and de-

fendant coal company, and the sale was confirmed absolutely on July 11, 1949.

In the meantime, on February 3, 1948, the Tremont Township School District, plaintiff herein, instituted an action in assumpsit against defendant coal company for delinquent school taxes, penalties and interest which had accrued against the 20 *seated* tracts for the fiscal years *1939 to 1947, inclusive*. Defendant's answer in that suit raised no issue as to its alleged ownership of the lands during the period of time involved in the suit. On June 20, 1949, this court entered a *partial* judgment *on the pleadings* in the assumpsit action in favor of the school district and against the coal company in the sum of $128,640.26. The judgment, together with an order of this court refusing to open it, was subsequently affirmed by the Supreme Court in an opinion by Mr. Justice Jones: Tremont Township School District v. Western Anthracite Coal Company, 364 Pa. 591.

That partial judgment on the pleadings, however, which is the basis of the present attachment execution proceeding, *was only for the face amount of the taxes and penalties claimed,* with leave to plaintiff to proceed sec. leg. with its claim for interest. The interest was excluded from the judgment only because the amount of that item of claim could not be determined summarily from the information supplied by the pleadings. It is apparent, therefore, that the *personal debt of record* represented by that partial judgment extends only to *the face amount of the taxes and penalties* on the 20 *seated* tracts for the *years 1939 to 1947*, plus such interest as has accrued upon the judgment *after* its entry, to wit, June 20, 1949. The significance of this fact will appear later.

On July 19, 1949, the Hickory Contracting Company submitted to the tax claim bureau a written offer "to purchase from the Tax Bureau at private sale for the

sum of $111,715.61, all lands held by the bureau in Tremont Township, which were sold to the County Commissioners as the property of Western Anthracite Coal Company, excepting those lands under 20% redemption agreements with the West Schuylkill Land Company." No specific price was stated as the bid for any one tract; in fact, no specific tracts were described at all in the offer. The offer, however, went on to state:

"It should be noted that the amount being offered for purchase of the property at private sale represents a percentage of the taxes actually owing which is substantially higher than the percentage recovered in any other similar settlement or sale. This offer is computed on the following basis: 25% of the delinquent taxes for all years prior to 1948 and 40% of the amount of delinquent taxes for the year 1948."

While the fact did not appear in the offer, it was testified in the present proceedings that the offer was actually computed in the percentage stated only on the basis of such taxes for those years *as had been returned to the county commissioners for collection,* and furthermore that it was computed on the basis of the *face amount* of such taxes only, without reference to or inclusion of penalties and interest.

Acting on the instructions of the county commissioners, the tax claim bureau submitted a petition, subsequently amended, seeking the approval of this court of the proposed private sale. The amended petition described, as the lands proposed to be sold, the 20 *seated* tracts and the nine *unseated* tracts hereinbefore mentioned. It was stated in the amended petition that if the sale were approved, the proceeds would be distributed and allocated among the interested taxing districts as follows: Schuylkill County Commissioners, county taxes, $25,154.63; Schuylkill County Commissioners, institutional taxes, $13,188.25; Tremont Township School District, $61,871.42; Tremont Town-

ship Supervisors, $11,501.31. The petition did not state how the bureau had arrived at the proposed division of the proceeds.

The school district filed objections to the proposed sale, but after hearing had, it was approved by this court on January 30, 1950, the writer of the present opinion dissenting. On February 6, 1950, the sale was consummated by payment of the purchase money and delivery of the deeds to the purchaser. The school district appealed, but the Supreme Court, again speaking through Mr. Justice Jones, affirmed the order of sale: Tremont Township School District Appeal, 366 Pa. 404.

The bureau allocated the proceeds of the sale among the several taxing districts in the amounts above indicated and after deducting from each share the four percent commission allowed to the county by section 207 of the Act of July 7, 1947, P. L. 1368, as amended, 72 PS §5860.207, the remainder of each share was paid over to the taxing district entitled thereto. Thus, the amount actually received by the school district was the sum of $59,396.56, which represents the $61,871.42 allocated to it, less the county's four percent commission.

Defendant coal company concedes that any credit to which it may be entitled can be claimed only out of such portion of the total proceeds of the sale as represents the school district's share in the proceeds of the *seated* lands. Its claim for a credit rests upon familiar principles. Taxes on seated land are the personal debt of the owner: Pennsylvania Co. for Insurance, etc., v. Bergson, 307 Pa. 44, 49-50; Frailey Township School District v. Schuylkill Mining Company, 361 Pa. 557, 563. The statutory lien makes the land against which they are assessed, in a sense, collateral security for the debt: Burkley v. Philadelphia et al., 339 Pa. 426, 429. If the lien on the land is

foreclosed and the tax debt is collected either wholly or in part out of the proceeds of the sale, the debt is pro tanto paid, and credit to that extent must be given: Blythe Township School District v. Mary-D Coal Mining Company, Inc., 354 Pa. 407, 411. The basic principle simply is, that the taxing district may not collect the same debt twice. But herein lies the real difficulty in the present controversy. To what extent has the school district collected from the proceeds of the sale the *same* indebtedness as is represented by the judgment?

The school district contends that it has not collected any portion of its judgment out of the proceeds of the sale. In support of this position it points out that even if the school district's entire share of the proceeds were deducted from the total amount of school taxes due upon *all* of the tracts, the unpaid remainder would still be far in excess of the amount of the judgment. This statement is undoubtedly correct, but the conclusion sought to be drawn from it does not necessarily follow. The fallacy of the argument lies in the school district's assumption that it is free to apply its entire share of the proceeds to the liens on whatever tracts it pleases. It is not at liberty so to do. Each and every one of the 29 tracts involved in the sale was separately assessed. The statutory lien of unpaid taxes extends only to the particular tract against which the taxes are assessed: Act of May 16, 1923, P. L. 207, sec. 2, 53 PS §2022; Act of May 29, 1931, P. L. 280, sec. 4, 72 PS §5971d; Act of July 7, 1947, P. L. 1368, sec. 301, 72 PS §5860.301; Boulton v. Starck, 369 Pa. 45, 49; Brundred v. Egbert et al., 164 Pa. 615, 622. As was said long ago in Woodburn v. Wireman, 27 Pa. 18, 21: "The act of assessing them severally imposes upon each tract its own burden (7 S. & R. 390); and neither can be sold for the taxes of the other. . . ." The same thought was expressed in the recent

case of Boulton v. Starck, supra, where it was said at p. 49:

"Property separately assessed must necessarily be separately sold at tax sales for the tax lien on one property is not a lien on the other even if the ownership be the same."

It follows that the proceeds of the sale of one tract may be applied only to taxes which were liens upon that tract, and not to taxes which were liens upon other tracts: In re Pennsylvania Central Brewing Co., 30 F. Supp. 930, rev. on other grounds, 114 F. (2d) 1010. In the case at bar, the proceeds of the *seated* lands may not be applied to the taxes on the *unseated* lands, or vice versa.

The school district, however, further contends that it is impossible in the present case to separate and allocate the proceeds, either among the individual tracts or between the seated tracts as one class and the unseated tracts as another class. It points out that the offer of the purchaser at the private tax sale was for *all* of the tracts for a lump price of $111,-715.61, and that neither in the offer nor in the subsequent sale proceedings was any specific price in dollars and cents set forth as the price to be paid for any one specific tract. This also is unquestionably true, and if there were nothing more in the record the difficulty in ascertaining the amount of credit to which defendant may be entitled would be almost insuperable. But it must be remembered that the purchaser's offer contained this further statement: "This offer is computed on the following basis: 25% of the delinquent taxes for all years prior to 1948 and 40% of the amount of the delinquent taxes for the year 1948"; and that it has been further testified here that the computation was actually based on the percentages indicated of the *face* amount only of such taxes for those years *as had been returned to the county com-*

*missioners for collection.* We recognize, of course, that a purchaser at a tax sale does not undertake to pay specific delinquent taxes for specific years or any portion thereof. He undertakes to pay a specific *price*, the application and distribution of which is controlled by settled principles of law. No matter how the purchaser "computes" his bid, any attempt on his part to direct and control the manner of applying the proceeds would be a nullity. Compare DeVine's Appeal, 30 Pa. 348, where a sheriff attempted to incorporate into the terms and conditions of sale the manner in which the proceeds were to be applied, and it was held that (p. 351) : "The law had prescribed what disposition should be made of the proceeds; and it was not in his power to change it." But in the present case the percentage formula was adopted by the purchaser merely as a basis for computing the *amount* of his bid. Considering the transaction in a practical light, and in view of the fact that the taxes on each of the tracts had been delinquent for many years, it is reasonable to conclude that the purchaser intended to pay and did pay for *each* tract *an amount equal to* 25 percent of the face amount of the delinquent taxes owing upon that particular tract to all of the several taxing districts for the years prior to 1948 which had been returned to the county commissioners for collection, plus 40 percent of the face amount of such taxes for the year 1948. When the transaction is so viewed, it affords a reasonable basis for determining the purchase price of each tract, and consequently a starting point in our inquiry into the amount of credit, if any, which should be applied against the judgment.

The principal difficulties in the case arise out of the failure of the tax claim bureau to follow established principles of law in the distribution of the proceeds. It was the duty of the bureau to pay over the net proceeds "to the respective taxing districts in proportion

to the taxes due them": Act of July 7, 1947, P. L. 1368, sec. 205, 72 PS §5860.205. Prior to the enactment of that statute, similar language in cognate statutes had been held to apply not merely to the amounts of the respective tax claims, but also to their respective priorities; that is, if the proceeds were not sufficient to pay all tax liens in full, the taxes oldest in point of lien were to be paid first: Lackawanna County Appeal, 157 Pa. Superior Ct. 137; Erie Appeal, 159 Pa. Superior Ct. 18; New Castle School District v. Travers et al., 353 Pa. 261. It must be presumed that the legislature intended the same construction to be placed upon the language used in the later statute: Statutory Construction Act of May 28, 1937, P. L. 1019, sec. 52, 46 PS §552; Kolonik v. Husdon Coal Company, 160 Pa. Superior Ct. 491, 494. The bureau should have used the purchaser's 25 percent—40 percent formula only for the purpose of determining how much of the total purchase price was allocable to each individual tract. It should then have distributed the amount thus allocated to each tract among the several interested taxing districts by applying it to the tax liens upon that tract in the order of their respective seniorities. Had it proceeded in that manner, the problem presently presented would have been relatively simple.

Instead of proceeding in that fashion, the bureau adopted the purchaser's 25 percent—40 percent formula as a basis for *dividing* the total purchase price of all the tracts *among the several taxing districts*. It allocated to each taxing district an amount equal to 25 percent of the face amount of taxes owing to that district on all of the tracts for the years prior to 1948 which had been returned to the county commissioners for collection, plus 40 percent of such taxes owed to that district for the year 1948. On that basis, there was paid over to the school district the sum of

$61,871.42, less the county's statutory 4 percent commission.

We may observe at this point that if the tax claim bureau had adhered to the rule laid down in the decided cases, the school district's share of the fund would have been substantially larger, because on eight of the nine *unseated* tracts the school taxes for 1937 were the oldest liens and therefore entitled to priority. However, we have no power in the present proceeding to change either the manner or the result of the bureau's division of the fund *among the several taxing districts*. That transaction is not presently before us for judicial review, and the other taxing districts are not parties hereto. We are here concerned only with the proper application of the school district's *share* of the fund to the several tax debts owed to it by defendant former owner. This issue must, of necessity, be decided on the basis of the amount the school district actually received; not the amount it should have received.

There was initially some confusion as to whether three municipal liens for school taxes, in the total face amount of $34,085.32, which had been filed in the prothonotary's office, had been considered and included by the bureau in computing the division of the fund among the several taxing districts. But it was subsequently shown by the testimony of the bureau's tax clerk that on the basis of the 25 percent—40 percent formula, as applied only to the face amount of school taxes returned to the county commissioners for collection and *not* including any of the three municipal liens, the school district's share of the proceeds of the *seated* lands was $31,784.81, and of the *unseated* lands, $30,055.52, making a total of $61,840.33. We have ourselves checked those figures against the bureau's detailed records, which were received in evidence, and have found the figures to be correct. While

the total of $61,840.33 is $31.09 less than the sum of $61,871.42, which was actually allocated to the school district, the figures demonstrate mathematically and beyond any possibility of doubt that the three municipal liens were *not* considered in computing the division of the fund among the several taxing districts. If they had been, the school district's share would have been increased by $8,521.33 to a total of $70,361.66. Even if the bureau had adjusted the figures in the municipal liens to take care of certain discrepancies therein which were first brought to light in the present proceedings, and had considered and included the municipal liens as so adjusted, the school district's share would have been increased by $8,049.36 to a total of $69,889.66.

The evidence as a whole makes it clear that the complicating effect of the three municipal liens did not arise until after the bureau had already divided the fund among the several taxing districts. The complication arose in the following manner. Having divided the fund in accordance with the 25 percent— 40 percent formula, the bureau was faced with the problem of closing out its own records. Among the bureau's records were copies of those three municipal liens, which had been certified to the bureau from the prothonotary's office pursuant to the provisions of the Real Estate Tax Sale Act of July 7, 1947, sec. 308(b), 72 PS §5860.308(b). The first of those liens had been filed August 28, 1942 to September term, 1942, no. 63, for school taxes for the year 1941 in the face amount of $13,061.46, plus penalties amounting to $598.62. The second one had been filed May 11, 1946 (see the Act of May 18, 1945, P. L. 723, sec. 1, 53 PS §2070.3, which extended the time of filing) to July term, 1946, no. 14, for school taxes for the year 1942 in the face amount of $9,398, plus penalties amounting to $1,597.66. The third one had been filed May 16, 1946,

to July term, 1946, no. 16, for school taxes for the year 1942 in the face amount of $11,625.86, plus penalties amounting to $1,976.40. The tax claim bureau assumed that the first and third of those municipal liens represented school taxes levied on the 20 seated tracts involved in the sale and no others. It further assumed that the second of those municipal liens represented school taxes levied on the nine unseated tracts involved in the sale and no others. It developed on the hearing of the present matter that the bureau was not correct in any of those assumptions, but for the moment we pass the discrepancies by. Although the bureau had not included those municipal liens in the application of the 25 percent—40 percent formula which it used in computing the division of the fund among the several taxing districts, it undertook to apply a portion of the $61,871.42, which it had allocated to the school district by virtue of that formula, to those three municipal liens. To accomplish that result, the bureau devised a *new* formula whereby it undertook to apply the $61,871.42 to all of the school district's liens on all of the lands for the years prior to and including the year 1948 on a *pro rata* basis. (There is no explanation as to why the *1949* liens were ignored, if a pro rata application were permissible. Cf. Erie Appeal, 159 Pa. Superior Ct. 18.) The bureau proceeded as follows: It added the total face amount of the school taxes represented by the three municipal liens ($34,085.32) to the face amount of the school taxes on all of the lands which had been returned to the commissioners for collection for all years prior to and including 1948 ($228,448.56), and thereby obtained a total of $262,533.88. It then divided this sum of $262,533.88 into the $61,871.42, which it had previously allocated to the school district, and thereby arrived at a percentage figure of 23.567 percent. It then applied this percentage figure of 23.567 percent to the face amount

of school taxes involved in each year's lien on each tract, whether seated or unseated, and entered the result on its records as the amount applicable to that particular lien. The effect of this manner of bookkeeping was that the bureau's records reflected an application of a total amount of $33,328.67 to the school taxes on the seated lands and $28,542.75 to the school taxes on the unseated lands; whereas on the basis of the 25 percent-40 percent formula which had been used in dividing the proceeds among the several taxing districts, the school district's share in the proceeds of the seated lands was actually $31,784.81, and the unseated lands $30,055.52. It will be seen at a glance that the bureau's bookkeeping method, involving as it did a proration of the school district's entire share of the proceeds of all of the lands as a lump sum without discrimination as to the source of its several components, resulted in the application of a portion of the school district's share in the proceeds of the *unseated* lands to the school district's liens on the *seated* lands.

Nevertheless, it is those pro rata calculations of the bureau on which defendant relies in order to establish the amount of credit it claims against the personal judgment. According to the testimony of the tax clerk, the bureau's proration method would apply the following amounts to the school district's liens on the seated lands: 1939, $1,448.15; 1940, $2,043.58; 1941 municipal lien, $3,078.19; 1942 municipal lien, $2,739.87; 1943, $3,583.08; 1944, $4,087,16; 1945, $4,087.16; 1946, $4,087.16; 1947, $4,087.16; 1948, $4,087.16; making a total of $33,328.67. Defendant disclaims any right to a credit for the $4,087.16 which the bureau undertook to apply to the 1948 liens, because the personal judgment did not include the 1948 taxes. But defendant does contend that all of the amounts which the bureau undertook to apply to the

school district's liens on the seated lands for prior years, in the total sum of $29,241.51, should be credited against the judgment, inasmuch as the judgment was for taxes for those years.

Defendant's claim for a credit in the amount of $29,241.51 loses sight of several facts and several important legal principles. *One very important fact is that the judgment debt does not include interest which had accrued on the taxes and penalties prior to the entry of the judgment.* That judgment did not adjudicate that no interest had accrued, or that defendant was not personally liable for it. Those questions were expressly left open by the very language of the judgment. In the present proceeding the question before us is this: What application has the law made of the school district's share of the proceeds of the sale of the lands, effected in the course of a statutory proceeding *in rem*? The record presently before us shows that interest did accrue as a matter of law upon the school district's several liens, and the amount of the interest can be readily calculated from information contained in the present record. The circumstance, that the pleadings in the assumpsit action were not sufficient to support summary judgment *in personam* for the item of interest, in no manner defeated the school district's right to collect the interest out of the proceeds of the lands in a proceeding *in rem*.

The interest accrued is an integral part of each lien: Act of May 29, 1931, P. L. 280, sec. 4, 72 PS §5971d; Act of May 16, 1923, P. L. 207, sec. 2, 53 PS §2022; Homestead Borough v. Defense Plant Corporation et al., 356 Pa. 500, 508-509, and it accrues not only upon the face amount of the taxes but upon the statutory five percent penalty as well: Hamilton v. Lawrence, 109 Pa. Superior Ct. 344, 350. The general rule is that partial payments are applied first to accrued interest, and only the remainder, if any, is applied in reduction

of the principal: Com., for use of Bellas, v. Vander-slice et al., 8 S. & R. 452, 458; Roberts' Appeal, 92 Pa. 407, 422; Bower v. Walker, 220 Pa. 294, 306. The amount which the bureau undertook to apply to each lien would be regardéd in law as having been applied first to the interest included in that lien, and only the remainder, if any, to the face amount of the taxes and penalties embraced therein. If the interest included in each lien were computed only to the date of the judgment, June 20, 1949 (in order to avoid duplication of interest thereafter accrued), it would more than absorb the entire amount which the bureau undertook to apply to the earlier liens, and it would substantially reduce the amount applicable to the face amount of the taxes and penalties embraced in each of the later liens. We find it unnecessary to set forth the calculations in detail, but our computations indicate that if the bureau's figures and pro rata method of application were correct and legally permissible, defendant would not be entitled to a credit against the judgment in excess of $4,392.49.

However, the bureau's pro rata method of application was erroneous both in fact and in law. It was erroneous in fact because, as was shown in the present proceeding, the three municipal liens included not only taxes on the tracts in question but also taxes on a number of tracts *which were not involved in the sale at all*. This error is reflected, first, in the amounts of the school taxes for the years 1941 and 1942 which were properly applicable to the tracts sold; secondly, in the proration percentage computed, and thirdly, in each and every one of the results obtained by the use of the proration percentage. When those errors were discovered in the course of the present proceeding, an effort was made by defendant to show by the testimony of the bureau's tax clerk what the corrected

figures would be. The tax clerk computed a revised proration percentage of 23.867 percent, which he said would result in an application of $32,960.19 to the seated lands and $28,466.31 to the unseated lands. But those calculations are also clearly incorrect, because the sum of the last two figures is only $61,426.50, which is $344.92 short of the school district's share of $61,871.42. Our own computations indicate that if proration were permissible the revised proration percentage would be 23.73772 percent, which would result in an application of $33,198.92 to the seated lands and $28,672.50 to the unseated lands, or a total of exactly $61,871.42. However, we find it unnecessary to pursue this line of inquiry further.

The bureau's proration method was entirely erroneous as a matter of law. As we have previously shown, the proceeds of one tract may not be applied to the tax liens upon other tracts. The bureau violated this legal principle by treating the school district's entire share of the proceeds of all of the tracts as a common fund, capable of pro rata application to all of the liens upon all of the tracts without regard to the amounts which the individual tracts had severally contributed to the fund. The result has been, as we have previously pointed out, that a portion of the school district's share in the proceeds of the unseated lands, based on the 25 percent—40 percent formula used in dividing the fund among the several taxing districts, was applied on the bureau's records to the liens on the *seated* lands.

Despite all of the foregoing manifest errors of fact and law, defendant contends that we are bound by the bureau's pro rata application of the school district's previously determined share, and the purely arbitrary "allocation" of that share between the seated and unseated lands which the bureau's records thus re-

flected. Defendant asserts that the bureau's action in that respect was "an administrative decision" which may not be "collaterally attacked." We see no merit in that contention.

In the first place, the bureau's attempt to prorate the school district's share among the school district's several liens was not a part of, nor did it have the slightest effect upon, the division of the fund among the several taxing districts. It was merely a matter of arbitrary bookkeeping subsequently devised by the bureau in an effort to make a colorable provision for the school district's three municipal liens which had been ignored both in the computation of the purchaser's bid and in the bureau's division of the fund among the various taxing districts. It had none of the attributes of a quasi-judicial decision. There is not a word of evidence in the record to show that either defendant former owner or the school district had knowledge of the bureau's method of applying the school district's share or opportunity to be heard as to it. Indeed, we have the uncontradicted statement of counsel that the school district had no knowledge of the bureau's pro rata method of applying the school district's share and the bureau's so-called "allocation" of that share between seated and unseated lands until the matter was brought to light in the present proceeding.

In the second place, it is well settled that an administrative body cannot invest itself with powers not fairly or properly within the legislative grant: Federal Deposit Insurance Corporation v. Board of Finance and Revenue, 368 Pa. 463, 472. The tax claim bureau was the agent, and therefore a fiduciary, of the interested taxing districts for the purpose of managing and disposing of the tracts turned over to it: Act of July 7, 1947, P. L. 1368, sec. 701, 72 PS

§5860.701. It was statutorily required to keep a separate account of the moneys received by it for each property (Section 205, 72 PS §5860.205), and therefore specifically prohibited from commingling the proceeds of separate tracts. Its fiduciary powers were strictly *in rem*. As was said in Tremont Township School District v. Western Anthracite Coal Company, 364 Pa. 591, 597:

"The powers of the Tax Claim Bureau under the Act of 1947 are limited to the enforcement of the lien of the taxes (levied against lands) by sequestration or sale thereof."

When the bureau sold these tracts, its sole remaining fiduciary function was to render to the several taxing districts an account of the proceeds and pay to each its proportionate share. *For the purpose of dividing the fund proportionately among the several districts,* the bureau had the right and the duty to inquire into the liens held by each district on each tract. This it did when it divided the fund among the several districts on the basis of the purchaser's 25 percent—40 percent formula, although it confined its inquiry at that stage of the transaction to the liens of such taxes as had been returned to the county commissioners for collection. But we find nothing in the statute, or in the general principles of law relating to fiduciaries, which would permit the bureau to go further and to treat any taxing district's share, as thus determined, in the proceeds of separately assessed tracts as a common fund; apply that share pro rata among the liens upon each of the tracts, and thus arrive at an arbitrary "allocation" of the district's share among the individual tracts. If the bureau's action in that respect be regarded as an attempt to exercise a power in rem, it was completely nugatory. Its action could not possibly affect the lands, because

the lands had been sold and the liens divested. If, on the other hand, the bureau's action be regarded as an attempt to determine and control the application of the school district's share to the former owner's personal tax debts which the school district's liens had secured, it was likewise ineffective. The bureau's jurisdiction did not extend to a determination of the reciprocal rights of the former owner and the school district *in personam*. It is settled law that action by an administrative body beyond its powers is void and always subject to collateral attack: Lackawanna County v. Commonwealth, 156 Pa. 477. It is clear to us that, for the purpose of ascertaining the credit against the personal judgment, the amount which the school district received as its share in the proceeds of each of the seated tracts is fixed by the 25 percent —40 percent formula used in the division among the several taxing districts, and not by the pro rata formula the bureau subsequently devised. The bureau's latter action will be disregarded.

The question then arises whether we may apply the school district's share in the proceeds of the seated tracts, as determined by the 25 percent—40 percent formula, to the school tax debts secured by the liens thereon by the use of that same formula. If this course were permissible, the debts secured by the municipal liens of 1941 and 1942 would be eliminated from consideration, because those liens were not included in the formula. There would be applied to the debts secured by the 1948 liens an amount equal to 40 percent of the face amount of school taxes for that year, but defendant could claim no credit for that amount because the judgment did not include the taxes for 1948. There would be applied to each of the liens on the seated tracts for the years 1939, 1940, 1943, 1944, 1945, 1946 and 1947 an amount equal to 25 percent

of the face amount of school taxes on those tracts for each of those respective years. From the amount thus applied to each lien, there would be deducted the interest on the taxes and penalties embraced in that lien computed to the date of the personal judgment. The remainder, if any, would be applied as a credit against defendant's personal liability for the taxes and penalties included in that lien. The sum of the credits, as thus computed, would constitute the full amount of credit against the judgment. On that basis, our computations indicate that the credit against the judgment would be $4,924.86.

We must bear in mind, however, that in legal contemplation we are not dealing with a compromise redemption by the former owner, which would seem to have been expressly forbidden by section 702 of the Act of 1947, 72 PS §5860.702, but with a private sale to a third party. We have considered the statement of defendant's counsel that the 25 percent—40 percent formula was originally devised by defendant former owner in an effort to effect a compromise redemption and was subsequently adopted by the Hickory Contracting Company as the basis for its offer to purchase the tracts presently involved from the tax claim bureau at private sale. If the record clearly showed that there was community of interest and purpose between corporate defendant and the corporate purchaser, we would not hesitate to leave defendant in a situation which it had a part in creating and would apply the school district's share in the proceeds of the seated lands in the manner last indicated. But the evidence of record will not support a finding of fact to that effect, and we are therefore required to regard defendant's rights as being the same as those of any other former owner of land sold at a tax sale. Considering the transaction in that light, we are convinced that the method of application discussed in the pre-

ceding paragraph is not permissible, and that the school district's share of the proceeds of the seated lands must be applied to defendant's several tax debts *in the order of priority of the liens by which they were respectively secured.* We now state our reasons for that conclusion.

We see no reason why the rights of a taxable with respect to the proceeds of a tax sale of land should be any different from the rights of a judgment debtor whose land has been sold at an execution sale. As was said in Brundred v. Egbert et al., 164 Pa. 615, 622: "In tax sales as in judicial sales the sale is the method of enforcing a lien." The law controlling the application of the proceeds of an execution sale of land was stated as follows in Herr v. Lancaster Trust Co., 47 Pa. Superior Ct. 63, 71, aff. 237 Pa. 344:

"The payment to an execution creditor of the proceeds of a sheriff's sale of real estate is not a voluntary payment by the debtor, but a payment in invitum. An execution creditor, having several liens upon the real estate sold, cannot apply such proceeds to whatever lien he pleases, but the law will apply them to such liens as are divested by the sale in the order of their priority."

That principle is not confined to controversies between competing lienholders. In Carneghan v. Brewster 2 Pa. 41, the question arose between the execution creditor, who held two liens, and one who had entered into a recognizance as security for the indebtedness represented by the earlier lien. The execution creditor contended that he was free to apply the proceeds of the sale to the junior lien, on which the execution had issued, or that at most he could only be compelled to apply the proceeds pro rata. Those contentions were not sustained, and it was held that the law had applied the proceeds to the liens in the order of their priority. In Appeal of Pennsylvania Company for Insurances on Lives and Granting Annuities, 18 W. N. C.

469, the controversy was between the execution creditor and the debtor's assignee, who of course stood in the debtor's shoes. The creditor had held two liens upon the real estate and claimed the right to apply the proceeds first to the junior lien. In denying his right to do so, the court said (p. 471) :

"The general rule undoubtedly is that one who owes money upon several distinct securities or accounts has a right to apply his payment to either, as he pleases; but, if he makes a payment generally and without specifically appropriating it, the creditor may apply it as he pleases. If neither debtor nor creditor makes any specific application of the money so paid, the law will appropriate it according to the equity and justice of the case. But this principle applies only in cases of voluntary payments. It has no place in payments *in invitum*, or where the money to be applied is the proceeds of judicial sale of real estate. In such cases the law applies the proceeds in order of their priority to such liens as are divested by the sale."

There can be little doubt that the private tax sale in the case at bar was a judicial sale, since it was consummated by virtue of a decree of this court: City of New Castle v. John Whaley's Heirs et al., 102 Pa. Superior Ct. 492, 496. But even if it were not a judicial sale, we would still regard the principles announced in the above cited cases as controlling. Those cases rest upon the fact that the proceeds of the sale are treated as an involuntary payment, and therefore the application is controlled by law, and not by either creditor or debtor. The same considerations apply to a tax sale. It will be remembered that in Lackawanna County Appeal, 157 Pa. Superior Ct. 137, supra, priority of lien was held to be controlling in the distribution among the several taxing districts. It would be a curious anomaly if a different rule prevailed between the taxing district

and the taxable. We are accordingly of opinion. that where a taxing district holds two or more tax liens on real estate sold at a tax sale, the law applies the proceeds received by the taxing district to the debts secured by its liens in the order of lien priority.

The legal situation which confronts us, then, is this: Having no power in the present proceeding to alter the bureau's division of the total purchase price among the several taxing districts, we must perforce accept the bureau's 25 percent-40 percent formula in order to determine the school district's share in the proceeds of each of the seated tracts. But in applying the school district's share to the debts secured by that district's liens, the taxable's substantive rights require us to make the application in the order of lien priority. We shall proceed in that manner.

The face amount of school taxes on the seated lands returned to the commissioners for collection for the years prior to 1948 was $99,390.88. Twenty-five percent of this is $24,847.72. The face amount of school taxes on the seated lands for 1948 was $17,342.73. Forty percent of this latter figure is $6,937.09. The sum of the two percentages is $31,784.81, which represents the school district's share in the proceeds of all of the seated tracts on the basis of the 25 percent-40 percent formula.

The same formula applied to the individual seated tracts gives the following amounts as the school district's share: M. Breininger tract, 40 acres coal, $659.80; M. Breininger tract, 14 acres barren, $3.84; M. Breininger tract, 30 acres barren, $8.23; J. Dreher tract, 109 acres coal, $3,116.47; R. Kinnear, 270 acres coal reserve, $7,422.30; R. Kinnear, 163 acres coal reserve, $4,660.42; R. Kinnear, 19 acres coal, $543.24; Meyer & Houtz, 32 acres coal, $914.93; Peter Bright, 76 acres coal, $1,002.86; Peter Bright, 19 acres coal,

$229.83; S. Meyer, 179.2 acres coal, $5,123.60; S. Meyer, 14.5 acres coal reserve, $398.61; J. Keffer, 117.4 acres coal, $516.38; J. Keffer, six acres coal reserve, $1.98; J. Harris, 360 acres coal, $5,938.20; J. Harris, 61 acres barren, $16.72; F. Spaetzer, one acre coal, $28.59; F. Spaetzer, 21 acres coal reserve, $577.29; F. Spaetzer, 20.2 acres coal, $577.55; and F. Spaetzer, 1.6 acres coal, $43.99.

When we examine the school tax liens against the individual seated tracts we find that in each case the liens are for the same years, commencing with the year 1939. We further find that in each case the school district's share is exhausted by the liens for 1939, 1940 and 1941. More specifically, we find that in each case there is sufficient to meet the taxes, penalties and interest in full for the years 1939 and 1940; that there is also sufficient to meet the interest in full for the year 1941, leaving in each case a small remainder to be applied to the face amount of taxes for that year. It will therefore be permissible, as a practical matter, to treat the seated tracts as a unit, without in any manner violating the principle that the proceeds of one separately assessed tract may not be applied to the liens upon other tracts.

The first step is to compute the amounts of the liens reached in applying the proceeds as of February 6, 1950, which was the date the private tax sale was consummated by payment of the purchase money and delivery of the deeds.

The total face amount of school taxes on the seated tracts involved in the sale for the year 1939 was $6,144.80, and the statutory penalties thereon amounted to $307.24. Those taxes and penalties had been returned to the county commissioners for collection, and therefore interest began to accrue on May 1, 1940: Act of May 29, 1931, P. L. 280, sec. 1, 72 PS §5971a. In determining the amount of interest

we have been unable to use the computations of the bureau's tax clerk. In the first place, we have found that instead of computing the interest to the exact date of sale, as we requested, the tax clerk computed it only to February 1, 1950. That, of course, was erroneous, since interest does not accrue from month to month but from day to day: Wertz's Appeal, 65 Pa. 306, 309; Davidson's Estate, 287 Pa. 354, 357. In the second place, the tax clerk computed the interest only upon the face amount of the taxes and not upon the penalties as well. This was likewise error. By the express language of the School Code of May 18, 1911, P. L. 309, sec. 561, 24 PS §608, the statutory five percent penalty was "made a part" of the tax: Brown, for use, v. LeSuer, 149 Pa. Superior Ct. 192, 197; In re West Salem Township's Auditors' Report, 62 D. & C. 253, 260, and therefore bore interest to the same extent as the original amount of the tax: Hamilton v. Lawrence, 109 Pa. Superior Ct. 344, 350. It is true that the tax clerk testified that it is not the practice of the tax claim bureau to compute interest upon the penalty. However, as was said in Commonwealth ex rel. v. Stewart, 286 Pa. 511, 519: "A practice of doing things in a different manner than the law directs cannot supersede valid legislation"; nor, we may add, can such practice supersede the decision of an appellate court. The interest accrued upon the penalties as a matter of law, and the school district's right thereto could not be defeated by the bureau's failure to perform a mere bookkeeping function. We have accordingly computed the interest upon both the original amount of the taxes for 1939 and the penalties thereon, and find as a fact that as of February 6, 1950, such interest amounted to $3,782.11. The total of the school taxes, penalties and interest on the seated tracts for the year 1939, as of February 6, 1950, was $10,234.15.

For the year 1940, the face amount of school taxes

on the seated tracts was $8,671.37, and the penalties thereon amounted to $433.57. Those taxes and penalties were returned to the commissioners for collection and consequently interest commenced to accrue on May 1, 1941. The interest on the taxes and penalties for 1940 amounted on February 6, 1950, to $4,790.98. The total of the liens for 1940 on the seated tracts as of February 6, 1950, was $13,895.92.

The taxes for 1941 require special discussion. They were not returned to the commissioners for collection but were included in a municipal lien filed August 28, 1942, to September term, 1942, no. 63, which claimed school taxes in the face amount of $13,061.46, plus penalties amounting to $598.62. However, in addition to the 20 seated tracts presently involved, this municipal lien described a number of other tracts which were not involved in the subsequent private tax sale, and moreover the amount claimed was set forth as a lump sum without any indication of the amounts of taxes due upon each of the several individual tracts therein described. A scire facias was subsequently issued upon this municipal lien to November term, 1947, no. 431, on which by agreement of counsel a verdict was rendered on May 19, 1949, in the sum of $18,926.04. We are informed by counsel that the amount of the verdict was computed by adding to $13,061.46, the face amount of taxes claimed, the sum of $5,265.96, representing interest on the former figure from August 28, 1942, plus the penalties claimed in the amount of $598.62. We have not been informed whether judgment was ever entered on the verdict, but, whether it was or not, the verdict having been entered by agreement and acquiesced in by the parties has the same binding effect so far as the doctrine of res adjudicata is concerned as a judgment entered thereon would have: American Surety Company of New York v. Dickson et al., 345 Pa. 328, 335. The

verdict, therefore, is the law of the case as to the amount of the municipal lien on May 19, 1949, and also as to the manner in which the amount was computed.

However, as we have previously stated, the municipal lien and the verdict thereon included taxes on a number of tracts which were not involved in the tax sale now under consideration. It is apparent, therefore, that in order to do justice in the present proceeding it will be necessary to determine what portion of the municipal lien and the verdict is properly attributable to the tracts presently involved. It is agreed by counsel, on the basis of an analysis and breakdown prepared by the bureau's tax clerk, that the face amount of the school taxes in this municipal lien which are properly applicable to the seated tracts involved in the sale is a total amount of $11,561.82. The penalties stated in the lien amount to $598.62. The record does not disclose how those penalties were computed. It is clear, however, that they are less than five percent of the face amount of $13,061.46 claimed in the lien; in fact, they represent only 4.582336 percent of that figure. We have concluded that the only just and equitable manner of apportioning the penalties would be to apply the percentage figure last mentioned to the sum of $11,561.82, which would give us $529.80 as the amount of penalties applicable to the liens on the seated tracts involved in the sale. The interest item of $5,265.96, which was included in the verdict, is 40.31678 percent of $13,061.46, the principal upon which it was computed. We therefore apportion the interest by applying this percentage figure of 40.31678 percent to $11,561.82, whereby arriving at a figure of $4,661.35 as the proportionate amount of interest applicable to the tracts in question. Accordingly, we have as to those tracts the following amounts: Taxes, 1941: $11,561.82; penalties, $529.80;

interest to date of verdict, $4,661.35, making a total of $16,752.97, which represents that portion of the verdict attributable to the seated tracts presently involved. But a further computation of interest is required because the verdict itself bore interest: Act of April 6, 1859, P. L. 381, sec. 1, 12 PS §781. Interest on $16,752.97 from May 19, 1949, to February 6, 1950, amounted to $724.28. Consequently, the total interest involved in the 1941 liens attributable to those seated tracts is found by adding to $4,661.35, which represents interest from August 28, 1942, to the date of the verdict, the sum of $724.28, which is the interest on the apportioned part of the verdict from May 19, 1949, to February 6, 1950, making an interest total of $5,385.63. The 1941 liens on the seated tracts presently involved therefore consist of the following items: Face amount of school taxes: $11,561.82; penalties, $529.80; interest to February 6, 1950, $5,385.63; total, $17,477.25.

To summarize, we set forth the following tabular statement of:

### LIENS REACHED

|        | Taxes       | Penalties  | Interest to Feb. 6, 1950 | Lien Totals |
|--------|-------------|------------|--------------------------|-------------|
| 1939:  | $6,144.80   | $307.24    | $3,782.11                | $10,234.15  |
| 1940:  | 8,671.37    | 433.57     | 4,790.98                 | 13,895.92   |
| 1941:  | 11,561.82   | 529.80     | 5,385.63                 | 17,477.25   |
| Totals:| $26,377.99  | $1,270.61  | $13,958.72               | $41,607.32  |

The next step is to apply the school district's share in the proceeds of the seated lands, which amounted to $31,784.81, to the foregoing liens in the order of their priority. The sum of the liens for 1939 and 1940 is $24,130.07. Subtracting this sum from $31,784.81 leaves $7,654.74 to be applied to the 1941 liens. But, by reason of the principle stated earlier in this opinion, the application must be made first in satisfaction of the $5,385.63 interest involved in those liens, which

leaves $2,269.11 to be applied in pro tanto satisfaction of the taxes for that year. Accordingly, we have the following:

APPLICATION OF SCHOOL DISTRICT'S SHARE TO
LIENS REACHED

|  | Taxes | Penalties | Interest to Feb. 6, 1950 | Totals |
|---|---|---|---|---|
| 1939: | $6,144.80 | $307.24 | $3,782.11 | $10,234.15 |
| 1940: | 8,671.37 | 433.57 | 4,790.98 | 13,895.92 |
| 1941: | 2,269.11 |  | 5,385.63 | 7,654.74 |
| Totals: | $17,085.28 | $740.81 | $13,958.72 | $31,784.81 |

It does not follow, however, that defendant is entitled to have the full amount thus applied to the liens credited as a payment against the personal judgment. As we have repeatedly pointed out, the judgment was only for the face amount of the taxes and penalties. Under the judgment defendant's personal liability for interest extends only to such interest as became incidental to the judgment after its entry on June 20, 1949. To state the matter in another way, defendant may claim as a credit against the judgment out of the amount applied to interest only such portion thereof as is incidental to the judgment subsequent to June 20, 1949. The total taxes and penalties on which the amount applied to interest was computed was $27,648.60. Interest on that amount from June 20, 1949, to February 6, 1950, is $1,049.89. Hence, we have the following:

APPORTIONMENT OF INTEREST

Interest on $27,648.60, from June 20, 1949, to February 6, 1950, duplicated in judgment; credit allowed .................................... $1,049.89

Interest not duplicated in judgment; credit not allowed .................................... 12,908.83

Total interest to February 6, 1950 .......... $13,958.72

We are now in a position to state the following:

APPLICATION OF SCHOOL DISTRICT'S SHARE BETWEEN
ITEMS IN JUDGMENT AND INTEREST NOT
INCIDENTAL TO JUDGMENT

| | | |
|---|---:|---:|
| To taxes, 1939, 1940 and 1941 ........ | $17,085.28 | |
| To penalties, 1939 and 1940 .......... | 740.81 | |
| To interest on $27,648.60, from June 20, 1949, to February 6, 1950 ......... | 1,049.89 | |
| | | |
| Credit against judgment ........ | $18,875.98 | $18,875.98 |
| To interest not duplicated in judgment ........... | | 12,908.83 |
| | | |
| Total proceeds applied .................. | | $31,784.81 |

Earlier in this opinion we adverted to the fact that on the basis of the 25 percent-40 percent formula the school district's share in the seated tracts was $31,-784.81, and in the unseated tracts $30,055.52, making its total share in all of the tracts $61,840.33, whereas the bureau actually allocated to the school district the sum of $61,871.42. The record does not disclose how the discrepancy or apparent overpayment arose; it may have been caused by a mathematical error in computation. To avoid any question about this relatively insignificant overpayment we have concluded that it should be apportioned between the seated and unseated tracts in the following manner:

| | | |
|---|---|---:|
| To unseated tracts: | $30,055.52/$61,840.33 of $31.09: | $15.11 |
| To seated tracts: | $31,784.81/$61,840.33 of $31.09: | 15.98 |
| | | |
| | | $31.09 |

The sum of $15.98 thus apportioned to the seated tracts will be allowed as a further credit against the judgment.

Consequently, we have the following credits:

| | |
|---|---:|
| Credit out of school district's share in proceeds of seated tracts .............................. | $18,875.98 |
| Credit out of overpayment of $31.09 .............. | 15.98 |
| | |
| Total credit against judgment .............. | $18,891.96 |

There remains to be considered the amount which may be collected upon the judgment. The credit, of course, should be applied as of February 6, 1950, which was the date the purchase price was paid to the tax claim bureau as the agent of the several taxing districts. We compute the judgment, as thus credited, as follows:

| | |
|---|---|
| Original amount of judgment, June 20, 1949 ........ | $128,640.26 |
| Interest thereon from June 20, 1949, to February 6, 1950 ...................................... | 4,884.81 |
| | $133,525.07 |
| Credit allowed as of February 6, 1950 ............ | 18,891.96 |
| Balance of judgment as of February 6, 1950 ...... | $114,633.11 |

Plaintiff is accordingly entitled to collect this sum of $114,633.11, plus interest thereon from February 6, 1950, plus costs of suit plus costs of execution. We are informed by counsel that the statutory penalty of 10 percent of the original amount of the judgment has not yet been added thereto, as is directed by the Local Tax Collection Act of May 25, 1945, P. L. 1050, sec. 21(b), 72 PS §5511.21(b). Plaintiff will also be entitled to collect this penalty, amounting to $12,-864.03, together with interest thereon from the time such penalty shall have been added to the judgment.

In the course of the foregoing opinion, we have had occasion to note a number of unusual features of this tax delinquency situation and of the private tax sale consequent thereto which had not been brought to the attention of this court when it was asked to approve the proposed private sale, and which were first brought to light in the course of the present proceedings. Before concluding, we feel impelled to refer to still another. In examining the tax records submitted in evidence, we notice a wide difference between the taxes charged against the lands for 1948 and those charged for 1949. For instance, the total of county, institu-

tion district, township and school taxes charged against the seated lands for 1948 was the sum of $35,323.37, whereas the corresponding figure for 1949 was only $16,076.15. The latter figure is only about 45½ percent of the former. The explanation given us by the tax clerk was that there had been a reduction in the assessed valuation. But this explanation leaves many other questions unanswered. When, why, by whom, and at whose request was the valuation reduced? Throughout both the years 1948 and 1949, title to the lands was in the county as trustee for the several interested taxing districts. While the lands, in such circumstances, were chargeable with taxes, there could be no assessment or reassessment in the proper sense of the term: Frailey Township School District v. Schuylkill Mining Company, 361 Pa. 557, 564. In a well considered opinion by Cummings, P. J., in the Appeal of Zerbe Township School District et al., 55 D. & C. 569, it was held that the assessed valuation of real property purchased at a county treasurer's sale by the county commissioners must remain unchanged as long as it is owned by the county, and that the county commissioners have no legal power to reduce it. If this fact, along with the other facts to which we have earlier adverted, had been brought to the attention of the court at the time it was asked to approve the private sale, the result in that proceeding might well have been different.

And now, April 21, 1952, the rule to show cause why a credit should not be allowed against the judgment is made absolute to the extent herein indicated. It is ordered that a credit in the sum of $18,891.96 be allowed as of February 6, 1950, against the judgment entered to March term, 1948, no. 193. It is further ordered and directed that the amount to be collected upon this judgment in the instant attachment execution or upon any other execution issued upon

this judgment shall not exceed the sum of $114,633.11, plus interest thereon from February 6, 1950, plus costs of suit, plus costs of execution, plus a penalty of $12,864.03, being the 10 percent penalty directed to be added by section 21(*b*) of the Local Tax Collection Act of May 25, 1945, P. L. 1050, plus interest on this penalty from the date the penalty shall have been added to the judgment.